Filed 7/29/21 (unmodified opn. attached)

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C088889 |
| Plaintiff and Respondent, | (Super. Ct. No. 17FE023605) |
| v. | ORDER MODIFYING OPINION AND DENYING REHEARING |
| ROBERT WILLIAM POTTER, | |
| Defendant and Appellant. | [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on July 13, 2021, be modified as follows:

On page 20, add the following paragraph immediately before the last full paragraph of part I of the discussion:

Nor are we persuaded by defendant's argument that even "if the interrogations did not start out with [defendant] in custody . . . , the interrogations certainly became custodial after his initial interview with Detective VonSchoech," i.e., after he "made confessions to one detective, was asked to remain to speak with another, and his cellphone was taken from him." Defendant argues "no reasonable person would have believed that they could leave" in these circumstances and therefore, at the very least, the last two interviews with

1

Detective Wirtz were custodial.  In a petition for rehearing, defendant characterizes VonSchoech's approach during the prepolygraph interview as "psychological coercion."  Defendant did not argue he was coerced into confessing in his briefing on appeal.  It is too late to do so in a petition for rehearing.  (*Singh v. Lipworth* (2005) 132 Cal.App.4th 40, 43, fn. 2.)  In any event, our review of the prepolygraph interview, relevant portions of which have been recited verbatim, confirms the trial court's view that it was far from coercive.  To be sure, defendant confessed during the interview with VonSchoech, but that alone does not render a subsequent interview custodial.  Nor does the fact that defendant agreed to hand his cell phone over for analysis at some point during the first of his subsequent interviews with Wirtz.  The relevant question is whether the totality of the circumstances would have caused a reasonable person in defendant's position to believe he was free to terminate the interviews and leave.  (*Moore*, *supra*, 51 Cal.4th at p. 395.)  For reasons already expressed, we conclude the answer to this question is yes.

There is no change in the judgment.  Appellant's petition for rehearing is denied.


FOR THE COURT:



 /s/
HULL, Acting P. J.



 /s/
HOCH, J.



 /s/
KRAUSE, J.


2

Filed 7/13/21 (unmodified opinion)

CERTIFIED FOR PARTIAL PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C088889 |
| Plaintiff and Respondent, | (Super. Ct. No. 17FE023605) |
| v. | |
| ROBERT WILLIAM POTTER, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Ernest W. Sawtelle, Judge. Affirmed.

Laurel Thorpe and Jacquelyn Larson, under appointments by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Dina Petrushenko, Deputy Attorneys General, for Plaintiff and Respondent.

_____

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts II, III, and IV of the discussion.

1

Defendant Robert William Potter sexually abused his daughter, H., when she was five years old. He admitted the abuse during an interrogation at the police station. Convicted of one count of oral copulation with a child 10 years of age or younger, defendant was sentenced to serve an indeterminate term of 15 years to life in state prison.[1]

On appeal, defendant contends: (1) his confession should have been excluded because it was unlawfully obtained during custodial interrogation without *Miranda*[2] warnings; (2) defendant's trial counsel provided constitutionally deficient assistance by failing to object to H.'s testimony on competency grounds; (3) the trial court prejudicially abused its discretion and violated defendant's federal constitutional rights by allowing the prosecution to amend the information during trial; and (4) the trial court's determination that defendant possessed the ability to pay a $5,000 restitution fine, as well as court security and court operations assessments of $30 and $40, respectively, is not supported by substantial evidence and violates his federal constitutional rights.

We affirm. As we shall explain, despite being at the police station when questioned by police, the totality of the circumstances reveal defendant was not in custody during that interrogation, and therefore *Miranda* warnings were not required. Defendant's trial counsel did not provide constitutionally deficient assistance by failing to object to H.'s testimony because a reasonable attorney could have concluded H. was competent to testify and further questioning regarding her competency would have so

---

[1] In addition to the count of conviction, defendant was charged with three counts of oral copulation with a child 10 years of age or younger, one count of sexual penetration with a child 10 years of age or younger, and one count of lewd or lascivious conduct with a child under the age of 14 years. The jury acquitted him of one of the oral copulation counts and was unable to reach a unanimous verdict with respect to the remaining counts. The trial court declared a mistrial as to the latter counts.

[2] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694].

established.  The information was also properly amended.  Finally, we conclude the trial court's ability to pay determination is supported by substantial evidence.

BACKGROUND

As previously stated, defendant sexually abused his daughter, H., when she was five years old.  At trial, H. testified to the details of the abuse.  The nature of the contentions raised in this appeal do not require recitation of those details here.  Instead, we shall set forth the circumstances surrounding defendant's confession to having sexually abused his daughter.

***Phone Call with Detective Wirtz***

In March 2017, H. disclosed the sexual abuse to her mother and provided additional details regarding that abuse to a police officer who responded to H.'s grandmother's house to take her statement.  About a month later, she revealed further details during an interview at the special assault forensic evaluation (SAFE) center.

Thereafter, Detective Jenny Wirtz called defendant to ask him whether he would agree to come down to the police station for an interview.  Defendant apparently missed that phone call and called Wirtz back.  Their phone conversation took place on December 5, 2017.

After some preliminary questions, Detective Wirtz asked defendant whether he had been sexually assaulted in his past.  Defendant acknowledged that was true.  The detective asked him to tell her about it.  Defendant revealed that his uncle had molested him when he was 12 or 13 years old.  After some follow-up questions, Wirtz told defendant that she believed "some things have been goin' on with some other family members" that "kinda stems from" defendant's prior abuse.  Defendant admitted engaging in inappropriate sexual contact with his brother and sister when he was still a child, and "one more on sister" when he was older, but claimed "[t]hat was a one-time thing."  The detective then directed the questioning towards defendant's relationship with H. and informed defendant:  "There's been some allegations."  Defendant responded that

3

he had not spoken to H.'s mother since she "took 'em away," referring to H. and K., another child defendant had with H.'s mother, adding: "So I - I have no information on anything."

We briefly pause our summary of the phone call to note that H.'s mother took H. and K. away from defendant in October 2015 for reasons unrelated to the sexual abuse. However, this was not the first time H. was taken away from defendant. H.'s mother did so when she was three years old after H. told her mother that defendant had played a "Popsicle game" with her and described defendant putting his penis in her mouth. H.'s mother immediately called child protective services, law enforcement became involved, and H. was interviewed at the SAFE center. Because H. was unable to answer any questions regarding the alleged abuse, criminal charges were not pursued. After about two years of keeping defendant's children away from him, H.'s mother ran into him at a fast food restaurant. Defendant denied abusing his daughter, H.'s mother believed him, and defendant reentered their lives.

Returning to the phone call between Detective Wirtz and defendant, the detective asked him to confirm that H.'s mother had taken H. away from him once before, which he did, prompting the detective to ask, "what was that about?" Defendant responded, "it was supposedly the same thing." Wirtz asked: "Which is what?" Defendant answered, "you called me about the sexual allegations." He then explained that H. had previously told her mother that "some bad man" had done "somethin' " to her, and that H.'s mother assumed it was defendant because he was "[t]he only man she was around," but defendant did not know any of the details. The detective responded: "And you didn't ask?" Defendant answered: "I don't care. I - all I cares about is seein' my daughter. I don't care about you tryin' to accuse me of somethin' if I know I didn't do it, and I'm tellin' you I didn't do it." Defendant then explained that what his uncle had done to him "messed up" his life, adding: "I'll be damned if I wanna mess up . . . my own kids at that."

4

At this point in the conversation, Detective Wirtz told defendant: "I think that you probably -- because of what you went through -- you know, would want your daughter to get the help that she needs." Defendant agreed. The detective then suggested defendant start with "telling the truth about what happened," adding: "You're essentially calling her a liar." The conversation became more and more contentious from this point forward, with defendant repeatedly denying having abused his daughter and the detective insisting that H. was telling the truth.

Eventually, Detective Wirtz asked defendant if he would be willing to come down to the police station to take a polygraph examination. Defendant agreed, but said he did not know when he would be able to do so. After further arguing over when that examination would take place, defendant said he would call back the next day to set up a time.

### *Prepolygraph Interview with Detective VonSchoech*

Two weeks after the phone conversation with Detective Wirtz, on December 19, defendant came down to the police station for the polygraph examination. He was placed in an interview room with Detective Konrad VonSchoech for a prepolygraph interview. The interview lasted about 30 minutes. At the start of the interview, VonSchoech informed defendant that the interview was completely voluntary, adding "you don't have to talk to me if you don't want." Defendant responded: "I got you." The detective advised defendant: "You can stop this anytime you want and walk out, there's the door." He then acknowledged that the door was closed, but explained that was "for privacy, but it's unlocked." Defendant stated: "Right I know what you mean." The detective continued: "You can walk out anytime you want, right?"

Detective VonSchoech then explained how a polygraph examination is conducted and told defendant: "I'm working here for you today, okay? I'm on your side and I want you to pass. I'm not here to judge you." VonSchoech then told defendant the purpose of the prepolygraph interview was to "come up with the right questions to ask you so that

5

you can pass." The detective asked defendant why he was there. Defendant explained he was accused of molesting his daughter. After some background questions regarding H., VonSchoech asked what she accused defendant of doing. Defendant explained that a detective had told him that H. accused him of sexually assaulting or molesting her. After further background questions regarding where defendant grew up and various other family members, VonSchoech asked about defendant's relationship with H.'s mother and the frequency with which he spent time with H. Defendant acknowledged he had H. "every weekend" for an unspecified amount of time when she was five years old.

Detective VonSchoech again asked defendant whether he knew what H. had accused him of doing to her. Defendant explained that a detective told him "a little bit about it" and also talked to him about his past. VonSchoech responded: "What - what about your past?" Defendant answered: "Um, yeah, I was molested." In response to follow-up questioning, defendant provided details about that abuse and acknowledged abusing his brother and sister when he was still a child. The detective said "that kind of puts things into perspective a little bit" and added: "I think a lot of these, um, incidents, um, you know, people do not want to hurt the other person. Um, a lot of it is learned behavior. Um, a lot of it is familiarity. Um, it's comforting to some degree." VonSchoech told defendant "nothing you say is going to shock me" and again stated that he wanted defendant to pass the polygraph examination.

The questioning then turned to the allegations of abuse. We provide much of it verbatim:

"[Detective]: You seem like a very nice guy and you seem like you want to do the right thing. Um, the only thing I - I don't understand though is something happened between you and [H.] though. Because she is saying these things. So I - I want you to feel comfortable talking about it. Um, because when I - when we make up the questions, I want to make up the questions in such a way that you're going to pass. Now, [H.] - according to the report [H.] said that you put your penis in her mouth.

6

"[Defendant]: That's what the detective said.

"[Detective]: Yeah, um, I don't think she's lying."

Defendant agreed that he did not think H. was lying and suggested it could have been someone else who did so. The detective responded: "Okay, well, I mean, she isn't saying that these people - she's saying that you did it. Um, and I - I - you don't think she's lying, I don't think she's lying. So there's got to be a reasonable explanation." The detective suggested there might have been "some regression maybe," or something defendant had not "dealt with" stemming from his prior sexual abuse. VonSchoech again said he believed defendant was "a nice guy," adding: "I'm sure you didn't want to hurt your daughter. It's, you know, never, right? You love her." Defendant responded: "Of course." The detective asked defendant whether he agreed that his daughter deserved "to know that this isn't going to happen again." Defendant answered: "Of course, my daughter's my world." VonSchoech told defendant: "I need you to tell me what happened and tell me why. Because that's the most important part is why." Defendant responded: "First of all, you're very good with your words." The detective said "it's not that," but rather that he could see that defendant had not "dealt with a lot of the stuff that happened" when he was a child, adding: "I can feel it." Defendant agreed: "I have a lot of pain from my childhood."

The following exchange then took place:

"[Detective]: Yeah, I can - I can - I can - I can sense it. And someone who hasn't dealt with that and doesn't know how to, um, doesn't know what they went through and how to internalize it and then deal with it . . .

"[Defendant]: Mm-hm.

"[Detective]: . . . they're going to act out. Whether they do it consciously or not. Okay. So again, I - I don't think [H.'s] lying. I think she said what she said. And she was very clear with what she said. But the most important thing here is why it happened and she deserves this - to know that it's not going to happen again. That's, I mean, you -

7

you owe it to her, okay.  Um, I - I don't know if your uncle ever stepped up and looked at you in the face and said, I'm sorry for what I did and it's never going to happen again, well, I think [H.] deserves that.

"[Defendant]:  I never got that.

"[Detective]:  Okay, because she will have to live with this for the rest of her life, until she has some sort of closure.  We can all learn from these experiences and we can all try to overcome them.  It'll take time, okay, but she's little . . .

"[Defendant]:  (Unintelligible).

"[Detective]:  . . . and you're her dad.  And you - and that's your job and your responsibility.  Okay?  When you look at that face, okay, you did some things to her that she deserves an explanation as to why they were done.  And if it[']s because it was done to you or because you weren't thinking or whatever - whatever it was, I don't deserve that explanation, she does.  Okay.  So I want you to tell me so I can try to understand." (Original ellipses.)

Defendant began his explanation with "it never really got fixed" and added:  "I've never gotten an apology."  He then explained that he apologized to his brother and sister for what he did to them.  The detective offered:  "And it's like [a] 100-pound weight taken off your back, right?"  Defendant answered:  "Yeah."  The exchange between defendant and the detective continued:

"[Detective]:  So when the time comes I hope that you have a talk with [H.] as well.

"[Defendant]:  Yeah, yeah.

"[Detective]:  Okay?  So, um, she said that, you know, she was three the first time you did something to her.

"[Defendant]:  And that's - I - I will sit on that chair.  I didn't touch her.  I didn't even have her when I . . .

"[Detective]: When was the first time you did something to her? How old was she? No, I - I want to know so I can figure out how to - how to move forward with this.

"[Defendant]: Um, first time was - she was older. It was the second time I'd got her so she was already older, years after I stopped seeing her the first time." (Original ellipses.)

The detective asked defendant "what happened," to which defendant answered: "Um, honestly, I don't know what the hell I was thinking . . . ." After some back-and-forth regarding defendant wanting to kill himself, his love for his daughter, and his inability to understand why he abused her, the exchange continued with:

"[Detective]: I can tell you love her so much.

"[Defendant]: That is my pride.

"[Detective]: Right?

"[Defendant]: That's my only daughter.

"[Detective]: I can - I can - I can feel that.

"[Defendant]: That is my pride and joy. . . .

"[Detective]: I can feel that. Okay? So we need to - we need to use this as a starting point.

"[Defendant]: I agree.

"[Detective]: For you to heal.

"[Defendant]: Oh, man.

"[Detective]: And for [H.] to love her dad unconditionally, okay? But before you get to that point, Robert, you've got to do the hardest thing and that is get it off your chest. There's some heavy stuff in there.

"[Defendant]: Yeah.

"[Detective]: Okay. And I believe you when you say you don't - you don't know why it happened, okay.

"[Defendant]: I don't.

9

"[Detective]:  But she gave us some details, okay.  She said that one time - well actually she said it happened a few times, but that, um, that you would - you would just have her get on - on her knees and you would put your penis in her mouth.  Does that sound like what happened?  Yeah?  'Cause this is - was that happening to you as well?

"[Defendant]:  Yeah."

The detective then asked defendant whether he knew what H. meant by saying that he "peed in her mouth."  Defendant answered:  "The detective said that and my - my guess is ejaculated."  In response to further questioning regarding whether defendant ejaculated, defendant stated:  "I may have accidentally but not on purpose . . . ."  When the detective responded, "it just happened," defendant agreed.  He again said he did not know why he abused his daughter and added:  "I've regretted my life ever since.  Like I really have."  The detective responded:  "No, I - I believe you."

Finally, after defendant denied engaging in a different sexual act with H., the details of which we need not recount, Detective VonSchoech told defendant he should "just tell the detective this," adding:  "I feel like you need to deal with it.  Okay?  I don't think you're a bad person.  I think you're someone who needs a lot of help."  Defendant agreed.

### Subsequent Interviews with Detective Wirtz

After speaking with Detective VonSchoech, defendant was moved to a second interview room to speak with Detective Wirtz.  At the conclusion of this interview, which lasted about one hour, the detective realized the video equipment in this interview room was not recording the interview.  She then asked defendant if he would be willing to speak with her in a third interview room.  Defendant agreed.  We also note that at some point during the unrecorded interview, defendant agreed to give his cell phone to the detective for analysis.  That analysis was apparently being done by someone behind the scenes while Wirtz spoke with defendant.

10

Defendant does not dispute that Detective Wirtz advised him at the start of the unrecorded interview that the door to the room was unlocked and defendant was free to leave. During this interview, defendant admitted one incident of oral copulation at a certain address where he lived "for a good part of 2015" with H.'s mother, H., and K. Defendant also admitted "about five" other incidents of oral copulation at a different address after he and H.'s mother broke up. Defendant was given an opportunity to write H. a letter of apology and did so. The letter read: "First off let me apologize to you for the pain that I have caused you. I never wanted to hurt you. The day you were born was the best day of my life. . . . Your dad was in a dark place and some things happened to me when I was a child that never got fixed. No one took the time to check on me and ask how I was feeling and because no one . . . taking an interest in me I did the same. So I'm here to say that I am sorry from everything in my body. You are a smart, beautiful girl and you will be great one day. I hope over time you forgive me but either way just know that I will . . . live my life knowing I hurt my daughter. And I have to live with that regardless of you choosing to forgive me or not. I haven't dealt with it in a good way but I'm ready to start healing. I'm ready to start healing. Love you always. Dad."

As mentioned, it was after defendant wrote this letter of apology that Detective Wirtz realized the interview had not been recorded and asked defendant whether he would be willing to talk to her again in a different room while he waited for his cell phone to be returned. Defendant agreed to do so. In the third interview room, the detective began by stating: "Um, so again thank you for coming in voluntarily. You're not under arrest. The door's unlocked. You['re] free to go, um, at any time." Defendant then confirmed his prior admissions to having engaged in acts of oral copulation with his daughter on six occasions at two different addresses. He also read his letter of apology aloud. This interview lasted about 15 minutes.

11

The total time defendant was interviewed by the detectives was "under two hours of questioning total." Defendant was allowed to leave the police station after these interviews were completed. He was arrested three days later.

DISCUSSION

I

*Admission of Defendant's Confession*

Defendant moved to exclude his statements made at the police station under *Miranda*. Relying primarily on *People v. Saldana* (2018) 19 Cal.App.5th 432 (*Saldana*) and *People v. Torres* (2018) 25 Cal.App.5th 162 (*Torres*), defendant argued he was interrogated by Detectives VonSchoech and Wirtz while "in custody" at the police station, and therefore, *Miranda* warnings were required. The prosecution opposed the motion, arguing the facts of *Saldana* and *Torres* "are quite different than [defendant's] case." The trial court denied the motion. After hearing argument from the parties, the trial court concluded the totality of the circumstances surrounding the interviews revealed defendant was not in custody within the meaning of *Miranda*. Defendant contends this was error. He is mistaken.

"An interrogation is custodial, for purposes of requiring advisements under *Miranda,* when 'a person has been taken into custody or otherwise deprived of his [or her] freedom of action in any significant way.' [Citation.] Custody consists of a formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest. [Citations.] When there has been no formal arrest, the question is how a reasonable person in the defendant's position would have understood his [or her] situation. [Citation.] All the circumstances of the interrogation are relevant to this inquiry, including the location, length and form of the interrogation, the degree to which the investigation was focused on the defendant, and whether any indicia of arrest were present. [Citation.]" (*People v. Moore* (2011) 51 Cal.4th 386, 394-395 (*Moore*).)

12

A more comprehensive, although not exhaustive, list of relevant circumstances includes "whether contact with law enforcement was initiated by the police or the person interrogated, and if by the police, whether the person voluntarily agreed to an interview; whether the express purpose of the interview was to question the person as a witness or a suspect; where the interview took place; whether police informed the person that he or she was under arrest or in custody; whether they informed the person that he or she was free to terminate the interview and leave at any time and/or whether the person's conduct indicated an awareness of such freedom; whether there were restrictions on the person's freedom of movement during the interview; how long the interrogation lasted; how many police officers participated; whether they dominated and controlled the course of the interrogation; whether they manifested a belief that the person was culpable and they had evidence to prove it; whether the police were aggressive, confrontational, and/or accusatory; whether the police used interrogation techniques to pressure the suspect; and whether the person was arrested at the end of the interrogation." (*People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1162.)

" 'Whether a defendant was in custody for *Miranda* purposes is a mixed question of law and fact. [Citation.] When reviewing a trial court's determination that a defendant did not undergo custodial interrogation, an appellate court must "apply a deferential substantial evidence standard" [citation] to the trial court's factual findings regarding the circumstances surrounding the interrogation, and it must independently decide whether, given those circumstances, "a reasonable person in [the] defendant's position would have felt free to end the questioning and leave" [citation].' [Citation.]" (*Moore*, *supra*, 51 Cal.4th at p. 395.)

The fact that an interrogation occurred at the police station does not, by itself, render the interrogation custodial; nor does the fact that the defendant was questioned as a suspect. (See, e.g., *California v. Beheler* (1983) 463 U.S. 1121 [77 L.Ed.2d 1275];

13

*Oregon v. Mathiason* (1977) 429 U.S. 492 [50 L.Ed.2d 714]; *Moore*, *supra*, 51 Cal.4th 386.)

For example, in *Moore*, the defendant was questioned in connection with the murder of a young girl who lived next door to him, a murder that was committed during a burglary of the girl's house while she was home alone. The defendant first agreed to answer questions in a patrol car outside his trailer and then agreed to go to the sheriff's station to give a more formal statement. (*Moore, supra*, 51 Cal.4th at p. 391.) At the station, he was taken to an interview room and interviewed by an investigator, Hanson, who was later joined by a second investigator. He was not handcuffed or otherwise restrained. Although the interview room door locked when closed, the keys were either left in the door or the door was propped open during the interview. The defendant was also told at the start of the interview that he was not under arrest and was free to leave at any time. (*Id*. at p. 398.) At some point during the interview, Hanson began asking questions indicating the defendant was a suspect. He pointedly asked the defendant whether he committed the burglary, urged him to tell the truth, suggested he might have burglarized the house because he needed money to buy heroin, asked him about a knife he was seen wearing earlier in the afternoon, and further asked whether he killed the child victim with that knife because she surprised him during the burglary. (*Id*. at p. 399.) Eventually, the defendant asked to be taken home. (*Id*. at p. 400.)

Our Supreme Court held the interrogation, at least up to the point the defendant asked to be taken home, was not custodial within the meaning of *Miranda*. (*Moore*, *supra*, 51 Cal.4th at p. 403.) The following circumstances supported this conclusion: "Hanson expressly told defendant he was not under arrest and was free to leave. Defendant said he understood. Defendant was not handcuffed or otherwise restrained, and there was no evidence the interview room door was locked against his leaving. The interview was fairly long—one hour 45 minutes—but not, as a whole, particularly intense or confrontational." (*Id*. at p. 402.) Acknowledging that the questioning eventually

14

became "more accusatory," the court explained: "*Miranda* warnings are not required 'simply because the questioning takes place in the station house, *or because the questioned person is one whom the police suspect.*' [Citation.] While the nature of the police questioning is relevant to the custody question, police expressions of suspicion, with no other evidence of a restraint on the person's freedom of movement, are not necessarily sufficient to convert voluntary presence at an interview into custody. [Citation.] At least until defendant first asked to be taken home and his request was not granted, a reasonable person in defendant's circumstances would have believed, despite indications of police skepticism, that he was not under arrest and was free to terminate the interview and leave if he chose to do so." (*Id*. at pp. 402-403.)

*Moore* controls the outcome here. As in that case, defendant went to the police station voluntarily. He did so to take a polygraph examination, apparently in the hope of passing the examination and thereby convincing law enforcement that he did not molest his daughter. For purposes of the *Miranda* analysis, we perceive no material difference between arriving at the station voluntarily to give a statement and doing so to take a polygraph examination. Taking a polygraph examination involves answering a series of background and potentially incriminating questions while connected to the polygraph machine. Moreover, unlike *Moore*, where the defendant was driven to the station in a patrol car after undergoing an initial interview at the scene, here, defendant came to the station on his own, two weeks after speaking with Detective Wirtz on the phone. While the phone conversation with Wirtz was more contentious than the in-car interview in *Moore*, and clearly indicated to defendant that he was suspected of having molested his daughter, defendant had two weeks to contemplate the decision to come to the police station to speak to police and undergo a polygraph examination. He voluntarily chose to do so.

Also like *Moore*, once inside the interview room with Detective VonSchoech, defendant was expressly told "you don't have to talk to me if you don't want" and "[y]ou

15

can stop this anytime you want and walk out, there's the door." While the door was closed, the detective told defendant that was "for privacy, but it's unlocked." Defendant said he understood. Defendant was not handcuffed or otherwise restrained. Moreover, this interview was only about 30 minutes long, much shorter than the interview in *Moore*. And as in that case, the interview with VonSchoech was not "particularly intense or confrontational." (*Moore*, *supra*, 51 Cal.4th at p. 402.) Indeed, the trial court described this interview as more like a "therapy session" than a typical interrogation. We agree with this assessment. While VonSchoech's professed understanding and sympathy were undoubtedly an interrogation tactic designed elicit a confession, and while the detective did indicate that he believed H.'s allegations and implored defendant to tell him the truth about molesting his daughter, "police expressions of suspicion, with no other evidence of a restraint on the person's freedom of movement, are not necessarily sufficient to convert voluntary presence at an interview into custody." (*Ibid.*)

After defendant confessed to having engaged in a sexual act with his daughter on multiple occasions, Detective VonSchoech asked defendant whether he would talk to Detective Wirtz about it. Defendant agreed. What would have been one additional interview turned into two when the detective realized the video recording equipment was not operating, but Wirtz informed defendant that he was speaking to her voluntarily and was free to leave at the start of each interview. During the first of these interviews, defendant provided additional details about the incidents of abuse and wrote H. a letter of apology. During the second, he confirmed these details and read the apology letter aloud. There obviously is no record of Wirtz's first interview with defendant. However, there is nothing confrontational about her second interview with defendant. Nor is there any reason to believe Wirtz's first interview was contentious enough to convert an otherwise voluntary interview into a custodial interrogation. Defendant had already confessed. Wirtz was simply getting the details of when and where the abuse occurred.

16

Finally, the total time defendant was interviewed by both detectives was "under two hours of questioning total," similar to the duration of the interview in *Moore*. While the length of the questioning is a relevant consideration, defendant was informed three separate times that he was free to leave, once at the start of each of the three interviews, there were no physical restraints placed on defendant's freedom during these interviews, and the tone and tenor of the questioning would not have caused a reasonable person in defendant's position to have believed he was not free to terminate the interviews and leave the police station. Indeed, even after confessing to six acts of oral copulation with his daughter, defendant was not arrested at the end of the interviews and was instead allowed to leave the station.

Nevertheless, defendant argues his interrogation was more "similar to the interrogations in [*Saldana*, *supra*, 19 Cal.App.5th 432], and [*Torres*, *supra*, 25 Cal.App.5th 162], which were determined to be custodial interrogations." We are not persuaded.

The interrogation in *Saldana* began much like the interview in this case, with the defendant voluntarily agreeing to speak to a detective regarding allegations of sexual abuse, arriving at the station on his own for the purpose of doing so, and being advised at the start of the interview that he was not under arrest and was free to leave. (*Saldana*, *supra*, 19 Cal.App.5th at pp. 455-456.) The Court of Appeal explained the latter advisement "indicates the beginning of the interrogation was not custodial" and "a reasonable person would have felt free to walk right out the door." (*Id*. at p. 457.) However, shortly thereafter, "the detective asked an unrelenting number of accusatory questions," the defendant repeatedly denied the accusations, and the detective refused to "take no for an answer." (*Ibid*.) In the court's view, this "persistent, confrontational, and accusatory" (*id*. at p. 459) manner of questioning transformed the voluntary interview into a custodial interrogation, explaining: "Where, as here, police indicate to the defendant their resolute belief he committed the crime, the custody inquiry becomes

17

whether a reasonable person in the defendant's situation—i.e., having been told by the police that they know he committed the crime—would think he was free to break off the interview and leave. As Professor Wayne LaFave has pointed out in his treatise, *Criminal Procedure*, when a suspect has been told by the police that he is not under arrest and can leave at any time, but the contemporaneous conduct of the police nullifies that advice, the advice 'will not carry the day.' [Citation.] Courts have concluded that, under the circumstances of the particular case, advising the suspect that he was not under arrest and was free to leave was insufficient to support a conclusion that he was not in custody for purposes of *Miranda*. [Citations.]" (*Id.* at p. 458.)

Citing *People v. Aguilera*, *supra*, 51 Cal.App.4th 1151, a case in which one of the interrogating officers told the defendant the interview would not end until "he told them the truth," leading that court to conclude a reasonable person in the defendant's position would have understood that to mean he could not leave until he confessed (*id.* at p. 1163), the *Saldana* court similarly concluded, "in light of the detective's repeated rejection of [the defendant's] denials, a reasonable person in [his] position eventually would have realized that telling the 'truth' meant admitting the detective's information was correct— and that until this 'truth' came out, the person could not leave." (*Saldana*, *supra*, 19 Cal.App.5th at p. 458.)

Similarly, in *Torres*, *supra*, 25 Cal.App.5th 162, the defendant voluntarily agreed to be interviewed regarding an accusation of sexual abuse. The interview took place in an unmarked police car in front of where the defendant lived. Before the interview, he was advised that he was not under arrest and was free to leave. (*Id.* at p. 167.) As in *Saldana*, the Court of Appeal explained the defendant's voluntary agreement to be interviewed and the officer's advisement that he was free to leave weighed against a finding of custody. Also weighing against such a finding was the short duration of the interview, about 45 minutes, the " 'matter of fact' conversational tone" used during the interview, and the fact that the defendant was not arrested until two weeks after the

18

interview. (*Torres*, at pp. 173-174.) Nevertheless, the court concluded the defendant was in custody, explaining the following circumstances had preponderate weight: the defendant was interviewed as a suspect, the interview took place in "a location controlled by the detectives," and "the detectives dominated and controlled the course of the interrogation and used interrogation techniques to pressure [the defendant], including telling [him] about false evidence, asking confrontational and accusatory leading questions, giving [him] choices and encouraging him to pick one of those choices, . . . minimizing the accusations against him," and "express[ing] their belief that [he] was culpable and they had evidence to prove it." (*Id*. at p. 176.) After providing a detailed description of these interrogation techniques, the court explained, "the detectives went further than the detective in *Saldana*, essentially telling [the defendant] they would not leave, and [he] could not return home, until [he] stopped lying and confessed to what the detectives could prove scientifically." (*Id*. at p. 179.)

By contrast, here, neither Detective VonSchoech nor Detective Wirtz used interrogation techniques remotely similar to those employed in *Saldana* and *Torres*. Defendant disagrees, describing their strategy as that of "good cop/bad cop" and noting that Wirtz was "aggressive, confrontational and accusatory" during her phone conversation with defendant. While we agree with the latter point, defendant does not argue that he was in custody during that phone call. Instead, he argues that phone call "set the stage" for the subsequent interviews at the police station. We do not doubt that is true. The phone call informed defendant quite clearly that he was a suspect and would be questioned about H.'s accusation that he sexually abused her. However, two weeks transpired before he came down to the station. We conclude he did so voluntarily and fully aware of the nature of the questioning he would likely face once he got there. Thus, while the nature of the phone conversation is relevant to the analysis as it forms part of the totality of circumstances surrounding the interrogations, in *Saldana* and *Torres*, it was aggressive and confrontational questioning *during the interrogations*, while those

19

defendants were face-to-face with officers in an environment they controlled, that combined to transform otherwise voluntary interviews into custodial interrogations. That is not the case here.

Because defendant was not in custody when he was interrogated at the police station, *Miranda* advisements were not required. The trial court did not err in denying defendant's motion to exclude his statements under *Miranda*.

## II

### *Ineffective Assistance of Counsel*

At the start of defense counsel's cross-examination of H., counsel asked whether she knew "the difference between the truth and a lie." H. answered: "No." After a few questions about "play[ing] pretend," counsel asked whether she knew "the difference between pretending you are a princess and real life." H. again answered: "No." Defendant argues these answers demonstrate H. was incompetent to testify and counsel should have objected to her testimony or requested voir dire on the subject of her competency. Counsel's failure in this regard, according to defendant, amounted to constitutionally deficient assistance. We disagree.

A criminal defendant has the right to the assistance of counsel under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution. (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.) This right "entitles the defendant not to some bare assistance but rather to *effective* assistance. [Citations.] Specifically, it entitles him to 'the reasonably competent assistance of an attorney acting as his diligent conscientious advocate.' [Citations.]" (*Ibid*.) The burden of proving a claim of ineffective assistance of counsel is squarely upon the defendant. (*People v. Camden* (1976) 16 Cal.3d 808, 816.) " 'In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his "representation fell below an objective standard of reasonableness . . . under prevailing professional norms." [Citations.] Second, he must also show prejudice flowing from

20

counsel's performance or lack thereof. [Citation.] Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." ' " (*In re Harris* (1993) 5 Cal.4th 813, 832-833; *Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 693].)

With respect to the element of reasonable performance, our Supreme Court has explained: "Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' [Citation.] Defendant's burden is difficult to carry on direct appeal, as we have observed: ' "Reviewing courts will reverse convictions [on direct appeal] on the ground of inadequate counsel only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for [his or her] act or omission." ' [Citation.]" (*People v. Lucas* (1995) 12 Cal.4th 415, 436-437.)

Defendant has not carried his burden of demonstrating unreasonable assistance. Notwithstanding H.'s answers to the two questions highlighted above, defendant's trial counsel could have reasonably concluded she in fact understood the duty to testify truthfully, and any objection to her testimony on competency grounds would have resulted in voir dire on the subject, during which H. would have demonstrated she understood the duty to testify truthfully.

Evidence Code section 700 generally provides that "every person, irrespective of age, is qualified to be a witness." (See, e.g., *People v. Lopez* (2018) 5 Cal.5th 339, 351 [two child witnesses, one six and a half and the other almost five years old, properly determined to be competent to testify]; *People v. Giron-Chamul* (2016) 245 Cal.App.4th 932, 958-961 [five-year-old victim witness properly determined to be competent to testify].) H. was nine years old when she testified in this matter. However, also

21

irrespective of age, a person is disqualified to be a witness if he or she is "[i]ncapable of understanding the duty of a witness to tell the truth." (Evid. Code, § 701, subd. (a)(2).) Viewed in isolation, H.'s answers to the questions noted above suggest she did not understand this duty. But counsel's decision to forego objecting to her testimony on this ground may well have been based on other indicators of her competency.

First, H.'s direct examination does not remotely indicate she was incompetent to testify. And aside from the two answers defendant highlights from the start of the cross-examination, the testimony that followed also indicates she was a competent witness. Second, prior to H.'s testimony, the trial court determined that both her statement to the police officer who questioned her after she initially disclosed the abuse and her subsequent SAFE interview were admissible under Evidence Code section 1360.[3] As part of that determination, the trial court pointed out that the officer spent "some time talking about the difference between truth and lies and what happens if you tell a lie . . . to determine whether or not the child was competent." Based on H.'s answers, "both in the SAFE interview and with the officer," the trial court found her "to be a competent witness" and added: "She seems to understand the difference between truths and lies." H. was seven years old at the time of these prior statements. In light of the fact that the trial court had already concluded H. was competent when she provided these statements

---

[3] This section provides in relevant part: "In a criminal prosecution where the victim is a minor, a statement made by the victim when under the age of 12 describing any act of child abuse or neglect performed with or on the child by another, or describing any attempted act of child abuse or neglect with or on the child by another, is not made inadmissible by the hearsay rule if all of the following apply: [¶] (1) The statement is not otherwise admissible by statute or court rule. [¶] (2) The court finds, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement provide sufficient indicia of reliability. [¶] (3) The child either: [¶] (A) Testifies at the proceedings. [¶] (B) Is unavailable as a witness, in which case the statement may be admitted only if there is evidence of the child abuse or neglect that corroborates the statement made by the child." (Evid. Code, § 1360, subd. (a).)

22

because she was able to demonstrate she understood the duty to tell the truth, defendant's trial counsel may well have concluded she would have been able to do so again. From a tactical perspective, counsel could rationally have concluded defendant was better served by allowing H.'s answers suggesting she did not understand the difference between the truth and a lie to stand rather than object to her testimony or request voir dire on the subject of her competency, during which H. likely would have erased all doubt.

Because the record does not affirmatively demonstrate defendant's trial counsel lacked a rational tactical purpose for declining to object to H.'s testimony on competency grounds, we cannot reverse his conviction for ineffective assistance of counsel.

### III

#### *Amendment of the Information*

Defendant further asserts the trial court prejudicially abused its discretion and violated his federal constitutional rights by allowing the prosecution to amend the information during trial. Not so.

#### A.

#### *Additional Background*

Detective Wirtz was the only witness at the preliminary examination. She testified to having witnessed H.'s SAFE interview, during which H. described several incidents of oral copulation at various locations, including defendant's house, his mother's house, and his sister's house. Wirtz also testified to having interviewed defendant, during which he admitted several incidents of oral copulation at "[a] couple different locations around Sacramento," as the detective put it, "just kind of wherever it presented itself." At the conclusion of the preliminary examination, the trial court held defendant to answer on all charges and deemed the complaint to be the information. Defendant's count of conviction, count two, charged defendant with violating Penal Code section 288.7,

subdivision (b),[4] by committing an act of oral copulation with a child 10 years of age or younger, "to wit, penis to mouth *at sister's house*." (Italics added.)

The evidence at trial did not support there having been an act of oral copulation at defendant's sister's house. H. testified that defendant put his penis in her mouth on more than 10 occasions. She described the details of three such occasions, one at defendant's mother's house, one at defendant's house, and one at a house where one of her brothers, R., lived. When the prosecutor asked whether she had ever been to defendant's sister's house, H. answered: "I think I have." She then testified that she thought the same conduct happened there on one occasion, but she did not remember the details. When asked why she thought it happened there, H. answered: "Because I have been to like another house, and he's only did it once there. I think it was at his brother's house." H. then confirmed she was certain defendant put his penis in her mouth at his house, his mother's house, and R.'s house, but was unsure about the fourth house where the abuse occurred. After H.'s testimony, her mother testified that neither of defendant's sisters lived in the Sacramento area.

In addition to H.'s testimony, defendant's statements to Detectives VonSchoech and Wirtz were admitted into evidence. As described in detail earlier in this opinion, defendant admitted six incidents of oral copulation at two different unspecified locations, one occurring before he and H.'s mother broke up and "about five" other incidents occurring after their breakup.

Based on this state of the evidence, the prosecution moved to amend count two to replace "at sister's house" with "at his house." Defense counsel objected, arguing the amendment was not supported by the evidence at the preliminary examination. The trial court allowed the amendment, explaining there was no requirement that the specific

---

[4]      Undesignated statutory references are to the Penal Code.

24

location of the act of oral copulation be listed in the information at all, and also noting that the evidence at the preliminary examination included defendant's confession to having committed about five acts of oral copulation with his daughter.

**B.**

*Analysis*

As relevant here, section 1009 authorizes the trial court to "permit an amendment of an . . . information . . . for any defect or insufficiency, at any stage of the proceedings . . . unless the substantial rights of the defendant would be prejudiced thereby . . . ." However, an information may not be amended "so as to charge an offense not shown by the evidence taken at the preliminary examination." (§ 1009.) This limitation preserves the defendant's due process right to notice of the charges against him or her, to have a reasonable opportunity to prepare and present a defense, and to not be taken by surprise by the evidence at trial. (*People v. Graff* (2009) 170 Cal.App.4th 345, 360.) As our Supreme Court has explained, "notice of the particular circumstances of an alleged crime is provided by the evidence presented to the committing magistrate at the preliminary examination, not by a factually detailed information." (*People v. Jennings* (1991) 53 Cal.3d 334, 358.)

Defendant argues the amendment to count two runs afoul of this limitation because it "added a new charge, not based on information brought forward in the preliminary hearing," and "[n]othing in the preliminary hearing or the information suggested that [he] was being charged with (and had to defend himself against) two separate acts of oral copulation occurring at [his] house." We are not persuaded.

The evidence at the preliminary hearing supported five counts of oral copulation. H.'s SAFE interview placed four of these acts at three different locations. Based on that interview, defendant was charged with four counts of oral copulation and the prosecution attached the three locations to the various counts in the complaint/information. However, as the trial court correctly observed, the location of the offenses was not material to

25

whether the offenses occurred. "When an offense involves the commission of, or an attempt to commit a private injury, and is described with sufficient certainty in other respects to identify the act, an erroneous allegation as to the person injured, or intended to be injured, *or of the place where the offense was committed*, or of the property involved in its commission, is not material." (§ 956, italics added; *People v. Pitts* (1990) 223 Cal.App.3d 606, 906 [absent unusual circumstances, "the place at which an offense is committed" is not material and "an immaterial variance will be disregarded"]; *People v. Thompson* (1934) 3 Cal.App.2d 359, 362-363.) As described above, the evidence at trial did not support commission of an act of oral copulation at one of the three locations listed in the information, i.e., defendant's sister's house. The information was accordingly amended to allege two acts of oral copulation at each of the two remaining locations. We conclude the evidence adduced at the preliminary examination was sufficient to provide defendant with notice that he committed one *or more* acts of oral copulation at his house. There was no error, constitutional or otherwise, in permitting the information to be so amended.

## IV

### *Ability to Pay Determination*

Finally, we also reject defendant's claim that the trial court's ability to pay determination, specifically, that he possessed the ability to pay a $5,000 restitution fine, as well as court security and court operations assessments of $30 and $40, respectively, is not supported by substantial evidence and violated his constitutional rights. In making this claim, defendant relies on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 for the premise that such a determination is constitutionally required. However, we are in agreement with the line of cases that conclude *Dueñas* was wrongly decided. (See *People v. Hicks* (2019) 40 Cal.App.5th 320, review granted Nov. 26, 2019, S258946 (*Hicks*); *People v. Kingston* (2019) 41 Cal.App.5th 272, 279-281; *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1067-1069; *People v. Caceres* (2019) 39 Cal.App.5th 917, 924-

929.) Stated simply, the strands of precedent relied upon by the *Dueñas* court in expanding due process protections to require an ability to pay determination before imposing a mandatory fine, fee, or assessment do not support, and indeed run contrary to, such an expansion. Imposition of the challenged financial obligations has not deprived defendant of access to the courts. Nor has defendant been incarcerated because of his inability to pay. Rather, he was incarcerated because of his crime.

Moreover, here, the trial court made an ability to pay determination, concluding defendant "could very well be in prison the remainder of his life, he is young. He's only 30. And he'll have plenty of opportunity to work in prison . . . and he'll be able to payoff . . . these fines." We agree with this assessment. "Should they remain unpaid at the end of his [prison term], the trial court will have to decide whether it was due to his indigence or to a lack of bona fide effort. At this point in time, however, due process does not deny defendant the opportunity to *try*." (*Hicks*, *supra*, 40 Cal.App.5th at p. 329, rev. granted.)

Nor has defendant persuaded this court imposition of the fines and fees in this case violated his Eighth Amendment right against excessive fines, as that right was recently described by the United States Supreme Court in *Timbs v. Indiana* (2019) ___ U.S. ___ [203 L.Ed.2d 11]. That case is so manifestly inapposite we decline to discuss it at all. Instead, we simply note defendant has cited us to no authority, nor have we discovered any on our own, supporting the position that the fines and fees imposed in this case are excessive in relation to either the gravity of defendant's offense or his economic situation. (*Id.* at p. ___ [203 L.Ed. 2d at p. 17].)

## DISPOSITION

The judgment is affirmed.

/s/
HOCH, J.

We concur:

/s/
HULL, Acting P. J.

/s/
KRAUSE, J.

28